Welcome back. Our third case this morning virtually is 19-1359, Doe v. University of Denver. Ms. Levy for the appellant, you may proceed. Thank you. Good morning, your honors, and may it please the court. My name is Adrienne Levy of the law firm Nessun Alpha Miltonburg, and I represent the plaintiff appellant here, John Doe. The key issue before this court is as follows. Did the plaintiff, John Doe, submit sufficient evidence to the district court such that a rational juror could find that the University of Denver employed gender bias when it investigated and adjudicated claims of sexual misconduct against John Doe? And the answer here is a resounding yes. As a result, the district court's order granting summary judgment to the defendant's plaintiff's Title IX claim should be reversed. The district court in this case made two critical errors that warrant reversal. First, the court granted defendant's motion for summary judgment on the basis that the plaintiff failed to prove his own entitlement to summary judgment rather than evaluating each motion separately on the merits. Second, the court failed to resolve all inferences in favor of the plaintiff, wrongly made fact and credibility determinations, and held plaintiff to a higher burden than is appropriate when opposing summary judgment. What do we do about your other case, I'll call it Doe 1. How do we get around the reasoning and holding in that case? Your Honor, I think that there's several distinctions in the cases. I think that the cases are factually distinct. Specifically, with regard to a lot of the procedural errors in the investigation and the adjudication, there's significantly additional errors here. Give me some examples. For example, I believe in Doe 1, there were only one or two witnesses other than the plaintiff and the respondent were interviewed. In this case, we had the complainant and the respondent were interviewed. The investigators interviewed an additional 11 people. 12 of them were good friends of the complainant, Jane Rowe, whereas they refused to interview friends of the respondent, John Doe. The reasoning that they provided was they had questions about the reliability of interviewing John Doe's friends. They had these concerns about John Doe, but they didn't have these similar concerns about Jane Rowe. Similarly, the evidence was significantly in favor of John Doe, but the investigators drew conclusions that were completely contrary to the evidence and, I guess, inexplicably favored the female complainant. For example, the complainant made a variety of different statements to her witnesses with factual distinctions. None of these distinctions were ever actually reckoned with by the investigators. They put the statements in there and then just conclude that Jane Doe's claims were completely corroborated. The reality is the only thing that was corroborated was she claimed after the fact that it was non-consensual, but the factual allegations of what she told the witnesses was all over the map. Specifically, the one witness that the investigators claimed was the most important witness here, who went by the initials GH, he directly contradicted Jane Rowe's factual retelling of events that she told the investigators. The only thing that they had in common was the conclusion that it was non-consensual. The investigators just sort of breezed over that and said, oh, it's totally corroborated because at the end, they both concluded that it was an assault, but the factual allegations were completely different. And so, you know, respectfully, there's a lot more error and a lot more meat in the record that shows that there was just consistent decision-making that inexplicably favored the female complainant over the male respondent, and that the explanations that were given were really contextual. One interpretation of that is the one that Judge Brimmer expressed, and that was it wasn't anti-male bias, it was anti-respondent bias, and that they had some sympathy for the accuser over the accused. And that's not covered by Title IX. How do we get around that? Your Honor, I'm glad that you brought that up because I actually wanted to get to that. So, I do want to talk about the pro-complainant versus, you know, pro-female sort of distinction. And I should note, as an aside, it seems that we're sort of all in agreement that there is evidence of bias in the case. The defendants seem to concede it in their briefs at page 9, 18, 19, 30, 38. The district court seemed to address it at page 14 and 21 of his decision. So, it seems that we're kind of all on the same page that a bias was indicated by the facts, but then the defendants and the district court drew this conclusion that it's not anti-male, it's anti-respondent, or it's not pro-female, it's pro-complainant. So, I have three crucial errors with this argument. The first one is, you know, that where the court appears to agree that there's bias, it should be up to a jury to determine whether that bias was based on a protected trait versus a non-protected trait that happens to line up in the exact same way. And I think this court, you know, even in Del 1, this court did acknowledge this sort of tricky nature of making that distinction and citing back to the University of Colorado case as well. So, my first argument would be that by making the determination about what motivated the bias, the district court improperly invaded the fact-finding mission of the jury. Should every case go to the jury then, or is there something particular about this one? Well, I would say that when there's sort of an agreement by everyone that there is an indicia of a bias, I don't think that it's necessarily the court's position to determine, and specifically when the bias happens to also break down along gender lines, I think that it should be up to a jury to decide whether that bias, in fact, was based on a non-protected trait or a protected trait where there's really not much of a distinction, you know, in actuality. Don't you, doesn't Del 1 take you into trouble there because the footnote 18, which is the big one, runs through all sorts of the same sorts of things that you're talking about as potential bias in the investigation, and no jury in that case. Correct. And so, I think that I have two more distinctions that I can make. I would just like to note that, you know, this court did hold in Buell Cabinet Company versus Suduth, which is 608 F. 2nd 431, quote, questions of intent involve many intangible factors such as witness credibility that are best left to the consideration of a fact finder after a full trial, end quote. So, I'll put that out there. I think one key difference, again, between Del 1 and this case is in the interim, the United States Department of Education has imposed the final regulations regarding Title IX, and the new Title IX regulations clearly and expressly prohibit investigators and adjudicators from harboring biases for or against complainants or respondents generally. And that's that 34 CFR 106.45B8. And I understand that the regulations, you know, are not necessarily retroactive, but they pertain to compliance with Title IX, and I think that they make clear the Department of Education's view on whether the, you know, anti-respondent, not anti-male distinction is still, you know, pedagogically viable. And I think that the answer we know now is definitively it's not. And I think that's a really key difference between this case and Del 1 is that in between these two cases, we have these new regulations making it very clear that the Department of Education views a pro-complainant bias as violative of Title IX. And I think that that's really important here. And I have a third factor. So, even if we, you know, think that it might not be a Jerry question as to what motivated the bias, even if we think that, generally speaking, the pro-complainant, not pro-female distinction is still viable, we still have an issue in this specific case. Because here, the enforcement statistics during the relevant time period make it clear that DU was not uniformly pro-complainant or pro-respondent, but specifically that it chose to pursue formal exclusively on behalf of female complainants. And it uniformly failed to pursue formal investigations of sexual misconduct complaints that were brought by male complainants. Uniformly, 21 complaints, not a single one went to a formal resolution. Similarly, Is that enough to raise an inference of anti-male bias? Or don't we need to know more about the reasons that those cases were treated differently? I think that it's enough to raise the inference. And when you combine it with all of the other factors in the case, I think it pushes you over into the plausible inference that gets us past summary judgment. Didn't Doe reject the same statistical argument that you're making now? Your Honor, there was a bit of a distinction. The original statistical argument in Doe 1 was based on the statistics of complainants and respondents full stop. It was that, you know, the number of complainants was overwhelmingly female and the number of respondents was overwhelmingly male. And the court did hold that, you know, it's not DU's fault who files a complaint. In this case, we're not talking about who came to DU and made a complaint. We're talking about DU's decision to pursue those complaints. And the decisions to pursue cut directly on gender lines here. And I think that creates a strong presumption. And, you know, I would like to point out that the district court in this case specifically said, if there was evidence that female complainants were treated more preferably than, I'm sorry, if there was evidence that female respondents were treated more preferably than male respondents, that would imply a gender bias. And the statistics here show exactly that. There were five total complaints that were made against female respondents. Four of them, which were brought by males, were summarily ignored. The only one that was formally pursued was the one that had a female complainant. And in that case, the respondent was given a deferred suspension, whereas a male student who was found responsible for the same violation in the same time period was given a full active suspension. So we have disparate. Did you present that particular example to Judge Brimmer? We presented the statistics, which is, you know, a two and a half page chart. And we did note that there was a discrepancy in enforcement and punishment. I think, you know, to be fully honest, I think we refined it more on the appeal. But I think that the issue is absolutely raised in the evidence that we rely on was 100% before the court and cited in our briefs below. That's a pretty small sample size. That's, you know, that's one example. And, you know, it facially it advances your argument a bit, but it just seems to me that we need to show that they were dissimilar. And was there, were you unable to find out any of the specifics of the cases so that we could have a apples to apples comparison? I don't believe that we had the specific details of the other adjudications other than just the basic, you know, gender of the complainant, gender of the respondent and outcome. What if the motivation were avoid controversy, which is to say rule for the complainants, so we don't have pickets, petitions, angry letters to the editor, and we all keep our jobs for another year. That may be a terrible motivation, and it may lead to sloppy investigations. And as you point out, the GH figures prominently in this one. But that's not within Title IX, is it? Isn't that for another remedy, a state court remedy? I would say it straddles the line, Your Honor. So, for example, in Doe versus Columbia, the Second Circuit held that when there's sufficient evidence of, you know, a public outcry and public pressure to avoid controversy, if that controversy tends to specifically address protecting women on campus, then again, it can be a factor, can be a background factor that pushes us into gender bias. Your Honors, I'd like to reserve a little time for rebuttal, but obviously, I'm happy to continue answering questions as well. You may. Let's hear from University of Denver, Mr. Goh. May it please the Court. I am Jim Goh, appearing on behalf of University of Denver and the individual appellees. As Chief Judge Tinkovich observed correctly early on, this case presents theories and arguments that have been rejected by the 10th Circuit in the John Doe 1 case, which was rendered about six months ago. The underlying theory here is that DU felt pressure by the Dear Colleague letter to stamp out sexual assault on campus, and it did so by favoring complainants over respondents. At the heart of this case is this notion that the vast majority of complainants are women and the vast majority of respondents are men. And given that reality, so the argument goes, any policy against sexual assault will have a disproportionate impact on men as opposed to women. Taking action against respondents is tantamount to taking of the disparate impact theory, a facially neutral policy or practice that has a disproportionate impact on members of a certain class. Disparate impact is not at play here. Even if it were a viable theory under Title IX, and there is some question about that, it is simply not played in this case. What if we, to advance that argument, what if you substituted a racial group instead of an anti-respondent or anti-male group, and it led to a disparate impact? Wouldn't that at least under Title IX law be a pretty good start to getting over-summer judgment? Under that hypothetical where we're talking about persons of a particular race, we're not talking about impact because now we're talking about an absolute certainty that such a rule would impact persons of that particular characteristic. So that's different from here where we're talking about complainants versus respondents. And the 10th Circuit in the Doe 1 case has clearly held that classification as a respondent is not classification based on gender. It is gender neutral because both men and women can be respondents. So this is an issue that has been taken up by this same court and has been concluding that to survive summary judgment, John Doe had to produce evidence of gender discrimination of district treatment based on his gender, and the district court found no such evidence. What about her statistical evidence? 100% one way, and then the only case involving a punishment. I mean, we see those in Title VII cases, Title IX cases all the time. Why isn't that enough? And why does it distinguish it from Doe 1? To begin with, as we argued in our brief, that is a brand new argument that was never presented to the district court. The district court had no occasion to address it. And for that reason, we believe that it is forfeited. But addressing the substance of that argument, John Doe claims that DU failed to investigate or failed to move forward 21 complaints that were filed by males. What they don't say is that DU moved forward on complaints filed by women, but not by males. In fact, if you look at the same spreadsheet that's cited in their brief, there are about 100 complaints filed by women that were not moved forward, that were not investigated. And there were many reasons for those decisions, including the fact that many complainants chose not to go forward, chose not to proceed, and also including the fact that there were alternate resolutions, such as the respondent deciding to transfer to another school. So these are all non-discriminatory reasons. And the 10th Circuit in Doe 1 has made it very clear that if you want to rely on statistical disparities, you must eliminate non-discriminatory explanations. And here, there were many non-discriminatory explanations that those statistics do not even talk about, do not even address. Counselor, let me ask you this question along both lines, which bothers me a little bit, and that's her statement and what the record is showing, that there was an investigation and talked to 11 witnesses on one side, and that no witnesses, even though the names were given, all were even summarily tried to be talked to. That bothers me in the factual recitation of what you have to say about that. Yes, well, in terms of the 13 people who had been interviewed at that point in time when the request was made for them to interview an additional five people, if you look at that list of people, it includes, in particular, the resident advisor, who was a close friend of John Mills, who was able to corroborate his version of the incident. So it doesn't matter. That's a basis of you making a factual determination that your people weren't going to interview any of his suggested witnesses. That in and of itself seems a little bit out of line. What that boils down to is not that there was a refusal to interview five people. We're talking about two people, because two of the five were his mother and his lawyer, and those were deemed to be inappropriate witnesses. What makes them inappropriate? Because they were support persons who were involved in the process all along. They were privy to all the, you know, to the investigation that was going on, and they would not have any kind of independent, any kind of independent information to provide. The recitation, excuse me, the recitation in the briefs that goes on and on about what his witnesses would have said, that's incorrect? Is that what you're saying? Well, we're talking about the two witnesses. One was his roommate, and the other was a friend. And so what the investigators did at that point in time, and the timeline is made for additional interviews, the investigators had already interviewed 13 people, had already prepared the preliminary report. All of which were her witnesses. I'm sorry? All of which were her witnesses. You said they've already interviewed 15 people, but all of which were her witnesses. I would not necessarily characterize that as her witnesses. They were witnesses that the the resident advisor. But if you look at the timeline, at that time, they had done all those interviews and discovered that there was a lot of duplication in the statements that they received. And for that reason, not a discriminatory reason, but for that reason, they asked John Doe to describe or to tell them what he thought, what information he thought those additional witnesses would have. Was that same requirement made of the witnesses that were interviewed on the young ladies? No, your honor, that was not. Why? Because at that point in time, they found out that there was a lot of duplication going on, and they wanted to avoid that. And so what they did was, was instead of interviewing those two individuals, they accepted the description as true. John Doe said, you know, his roommate would say X, Y, Z. And the investigator said, fine, we will accept that as true at face value, that they would say X, Y, Z. So, and we all agree that we're here on a grant of summary judgment. Is that correct? Yes. Yes. Thank you. And could, Mr. Gok, could there ever be an investigation that's so one-sided that it could create an inference of anti-male bias? Perhaps. And John Doe, one talks about a situation where if the evidence points substantially in one direction, and the investigators go exactly the opposite direction, that might create... And there's actually quite a few, you know, there's cases that go both ways in this area over the last couple of years, and the Sixth and Seventh Circuit, I think, have let cases go forward to trial. You know, they all have their different facts, but, you know, I think in at least one of them, you know, kind of a one-sided investigation was a factor. In another, I think it might have been the Department of Education's guidance letter, you know, so it's a mix of different cases, but the cases seem to accept that some of those factual issues can create an inference that maybe gets you over a motion to dismiss more easily than a motion for summary judgment, obviously. An illustrative case is the Purdue case, where the circuit court reversed the motion, the dismissal on a motion to dismiss, based on evidence that the university official made credibility judgments without even talking to the complainant, without having even seen a statement made by the complainant. So I would agree that there are certain sets of facts that would be, that would, combined with perhaps other facts, create an inference of discrimination. You know, one, go ahead and finish your thought. I'll just say that we don't have those facts here. You think they were open-minded going into the investigation? At least that's what they chose. I'm sorry. Yes, I do think so. And schools find themselves in this unenviable position of having to play judge and jury on matters to which there is probably never going to be absolute certainty. We will never know the absolute truth. So all the school could do, all DU could do in this case, is to make a judgment based on credibility assignments, based on the interviews and investigation, that it was more likely than not that there was non-consensual sexual contact. A technical question. The court, in this case, and I don't think in Doe 1, appeared to apply the McDonnell-Douglas burden-shifting framework. And we have held in cases that it applies to, at least in the Title IX employment area. Should it, McDonnell-Douglas, be the proper evaluative framework here? The John Doe 1 case never made any reference to the McDonnell-Douglas burden-shifting paradigm. And the district court certainly did not reference McDonnell-Douglas either. But I don't think that needs to be decided here because the threshold... I think it does if we want to apply the right framework. Well, the threshold question of whether or not there was sufficient evidence to create an inference of discrimination, which is part of the primary fishery case, that was never met. And therefore, there was no need to go into the burden-shifting. But I think that even applying the McDonnell-Douglas standard, the same conclusion would apply because the same conclusion that there was insufficient evidence to create an inference of discrimination would, under McDonnell-Douglas, warrant a dismissal on summary judgment. Yeah. And I thought, early, what I thought were making no showing of pretext-type arguments when you were talking about the record. I'm sorry, I didn't hear you. You were making an argument that there was no showing of pretext. And that's the same to the extent that there is... Given the conclusion that there was no evidence of gender discrimination, it necessarily means also that there will be no showing of pretext. And with the remaining minute and a half, if I might, I'd like to address this argument that there was one female who was given a lighter penalty than the male. The argument is that the one female was given a deferred suspension for engaging in non-consensual sexual contact, whereas a male was given a full suspension for engaging in what they claim to be identical conduct. But let's look at the conduct. The female was found responsible for non-consensual touching, whereas the male was found responsible for non-consensual touching and non-consensual kissing. This is not an apples-to-apples comparison. There's also the issue about the training document that makes use of the feminine pronoun. The problem is that there is no evidence in the record of who, why, to whom. There's no evidence, there's nothing in the record showing who created that document, what was its purpose, and who was its intended audience. All we have is a recollection of the former employee that he recalls seeing that document in a break room at the CAPE Center, a completely different unit on campus. There is no evidence tying that document to the investigators or to any person in the Title IX office. And for that reason, it just doesn't, it's not sufficient to create an inference of discrimination. I see that my time is up. I got it. Is that document in evidence? Yes, it is. Yes, it is, Your Honor. Thank you, Your Honor. Okay, counsel, your time's expired. Thank you for the argument. We have a little bit of rebuttal time for Ms. Levy. I hope you're on mute. Thank you. Thank you, Your Honors. And I'll try to move quickly because I want to address, you know, the most things that I can. As far as the comparator female respondent, to correct Mr. Gough, we didn't say that it was identical conduct. The violation was identical. And DU discusses at length that certain violations require certain sanctions. And specifically, I think they made the argument here that, you know, non-consensual penetration always needs a dismissal. And so, you know, when we're talking about the sanction is based on the violation, the disparate treatment that we have in the statistics shows the same violation, different sanction. The sanction against the female respondent was lighter. So I think that's an important point to make. As far as the training materials that appeared to show a gender bias, again, there's this statement that there was, quote, no evidence in the record as to who created it. The document itself is in the evidence. It has a Denver University header. It is a student footer. It's clearly created by Denver University. And it was testified to by a former DU employee that it was a DU document. So this is exactly the sort of factual argument that the district court resolved in favor of the defendants, which violates the standard on opposing a summary judgment motion. I do want to make, you know, I see that my time is up. Yeah, one final thought and then we'll wrap up. I appreciate that. I just want to note that it seems that a lot of Mr. Goh's arguments about the way that they're framing our claims here. He's trying to fit it into DOE 1. And I think that we made a very different claim here than was made in DOE 1. And I'll rely on the briefs, of course, for that. Thank you, counsel. We appreciate your arguments. Your excuse. Thanks for appearing remotely today. The case shall be submitted. Thank you, your honors.